

# IN THE
# TENTH COURT OF APPEALS

### No. 10-21-00029-CV

## IN THE INTEREST OF A.M.H.-C., A CHILD

**From the 74th District Court
McLennan County, Texas
Trial Court No. 2019-3694-3**

## MEMORANDUM OPINION

After a *de novo* hearing, the referring court signed a final order terminating the parental rights of A.M.H.-C.'s father (alias Donald).[1] The referring court found that Donald had violated Family Code subsections 161.001(b)(1)(N) and (O) and that termination was in A.M.H.-C.'s best interest. The referring court further appointed the Department of Family and Protective Services (the Department) as A.M.H.-C.'s permanent managing conservator.

---

[1] The parental rights of A.M.H.-C.'s mother were also terminated in the underlying case, but she has not appealed.

Donald appeals from the referring court's final order of termination. He contends in three issues that the evidence is legally and factually insufficient to support the referring court's findings against him. We will affirm.

**The Evidence[2]**

Department caseworker TiEsha Irby testified that the Department became involved in this case because A.M.H.-C.'s mother (alias Amy) tested positive for drugs in the hospital when A.M.H.-C. was born in early October 2019. Irby further acknowledged that Donald was not the offending parent in this case and was not any part of the reason for the removal of A.M.H.-C. Donald testified that he first learned of A.M.H.-C.'s birth when someone from the Department contacted him soon after A.M.H.-C. was born and told him that he was A.M.H.-C.'s father and that A.M.H.-C. was in the Department's care.

Donald testified that at that time, he did not believe that he was A.M.H.-C.'s father. Donald explained that he and Amy had never been in a relationship and that they had engaged in sex on only three occasions. When he had heard through mutual friends that Amy was pregnant, he had not suspected that he was the father of Amy's child because he and Amy had always engaged in "protected sex" and because he believed that Amy

---

[2] In his briefing, Donald refers both to the evidence that was before the associate judge at the trial and to the evidence that was before the referring court at the *de novo* hearing. In our review, however, we must consider only the evidence that was before the referring court at the *de novo* hearing, and the referring court did not consider the record from the trial before the associate judge in reaching its decision in this case. *See In re J.R.*, No. 07-18-00240-CV, 2018 WL 7488914, at * 1 (Tex. App.—Amarillo Sept. 26, 2018, no pet.) (mem. op.) ("The pertinent scope of review is quite settled and not in dispute. . . . That standard obligates us to review the evidence before the trial court."). The reporter's record or transcript from the trial before the associate judge was never offered or admitted as evidence at the *de novo* hearing. And in a letter to counsel after the *de novo* hearing, the referring court stated: "On September 30, 2020, the Court conducted a de novo final hearing in this case. At the conclusion of the hearing, I took the ruling under consideration. *After considering this matter and reviewing the evidence admitted*, I have reached a decision on the contested issues." [Emphasis added.]

had been involved with someone else around the time that she had become pregnant. Donald nevertheless attended the permanency conference regarding A.M.H.-C. at the Department on November 14, 2019.

Irby testified that the Department would have notified Donald about the permanency conference. Irby also recalled going out to Donald's home *before* the permanency conference because the Department was trying to complete the Family Plan at that time. Irby stated that the Family Plan that the Department develops, which outlines the services in which the parents become required to engage, must be completed before the permanency conference and that the Family Plan is then discussed during the conference. Accordingly, although Irby could not remember the specific date that she went out to Donald's home, Irby was sure that she spoke to Donald and created the Family Plan *before* the permanency conference. Irby testified that Donald, Amy, and a woman who was purportedly Amy's aunt then attended the permanency conference at the Department. Irby stated that Donald signed in as "the father" and that the services in which the Department expected Donald to participate were discussed at the permanency conference.

Donald, on the other hand, testified that he was notified about the permanency conference by Amy, not by anyone from the Department. Donald also explained that although Irby had come out to his home in November 2019, she had done so *after* the permanency conference. Donald further denied that he had received a Family Plan at the permanency conference and denied that the Department had discussed with him at the permanency conference any of the services in which the Department wanted him to

participate. According to Donald, Irby did not even attend the permanency conference because she was on vacation at the time. Donald testified that the Department talked to him and Amy at the permanency conference about whether A.M.H.-C. had any medical issues, about Amy's "requirement," and about placing A.M.H.-C. with the aunt. Donald further informed the Department that he wanted a DNA test at that time, and the Department explained to Donald that he could request a DNA test from the trial court the following week.

The Family Plan itself, which was offered and admitted as evidence, shows that the "Plan Completed/Conference Date" regarding Amy was November 14, 2019. Regarding Donald, however, the Family Plan indicates that the "Plan Completed/Conference Date" was November 21, 2019. But both Irby and Donald agreed that no conference was held on November 21, 2019.

Donald testified that on November 19, 2019, he requested from the trial court, and the trial court ordered, a DNA test. Donald further stated that the trial court asked him at that time if he wanted to start having visits with A.M.H.-C. Donald responded that he did not think that it was appropriate to have visits with A.M.H.-C. until he found out the DNA test results. Donald explained to the trial court that he did not think that A.M.H.-C. should bond with him and vice versa if he was not A.M.H.-C.'s father. Irby testified that she did not recall if that is exactly what Donald had told her, but she agreed that it would not have necessarily been a good thing for A.M.H.-C. or Donald to develop a relationship that might have been taken away if the DNA test results had shown that Donald was not A.M.H.-C.'s father.

As referenced above, Irby and Donald both testified that Irby nevertheless visited Donald's home before the DNA test results were returned, sometime in November 2019. Irby testified that she believes that she and a coworker had set up an appointment to go out to Donald's home. Irby and her coworker then went to the address that Donald had given Irby. Irby stated that there appeared to be a trailer home located there on the property but that she could not be sure because Donald would not allow her and her coworker on the property. According to Irby, Donald instead came outside of the "security gate" on the property and spoke with Irby and her coworker while they remained in their car.

Donald, on the other hand, testified that when Irby called, Irby asked if they could meet with him but never mentioned that it would be "a home visit." Donald told Irby that he was in Waco and that he could meet her at 11 a.m. because he was going to take lunch around that time. Donald testified that he stays in Austin most of the time but that sometimes, he stays in a trailer on his property in Waco. The property is located "out in the country," and he has horses, cows, and goats there. Donald further testified that he is self-employed and that the nature of his business is towing but that he also buys junk cars. On the day of the meeting with Irby, Donald had hired some people to come and crush cars for him at his house. Once the cars were crushed, Donald would take them and sell them to salvage.

Donald testified that when Irby and her coworker arrived at the property, the goats were out in the front, so Donald stepped outside of the "cattle gate" and closed it behind him. According to Donald, Irby and her coworker did not ask to come inside the

gate. But Donald further testified that after Irby and her coworker arrived, Irby told him that they wanted to do a home visit. Donald told them at that time that he was under the impression that they just needed to meet with him. Donald testified that if Irby had said previously that she was coming out for a home visit, he would have scheduled the meeting during a time when he was available and not just during lunch. When asked if he thus told Irby and her coworker that they could not come into his home, Donald replied that he told them that he did not think that he should do anything until they found out if A.M.H.-C. was his child.

Irby testified that she did recall Donald saying at some point that he did not want to work services until he knew that he was A.M.H.-C.'s father. The Department even documented in the Family Plan that Donald "does not want to participate in the Family Plan or participate in any services until he has the DNA results to show if he is the father or not." When Donald was asked why he would tell the Department that he did not want to work services until he received the DNA test results, he replied that he thought that it was the appropriate thing to do. When Irby was asked if there was anything wrong with Donald postponing working services until he knew that he was A.M.H.-C.'s father, Irby answered, "No, sir."

When the DNA test results were subsequently returned, they established that Donald was A.M.H.-C.'s father. The trial court therefore signed an order on January 28, 2020, establishing a parent-child relationship between Donald and A.M.H.-C.

Irby testified that she thereafter notified Donald of his paternity of A.M.H.-C. on February 3, 2020, which Donald confirmed during his testimony. Irby stated that she also

attempted to explain the Family Plan to Donald at that time. The Family Plan required the following of Donald: (1) "participate in a psychosocial exam"; (2) "provide a safe and stable environment for [A.M.H.-C.]"; (3) "provide pay stubs to show financial status that he is able to provide for [A.M.H.-C.]"; and (4) "participate in random drug testing." Irby testified that Donald's Family Plan was "[v]ery simple," and Donald agreed that it could be classified as "easy." Irby stated that Donald told her at that time, however, that he would not talk to her any further and that she needed to talk to his attorney. Irby testified that that was not an unreasonable request by Donald, but Irby agreed that it also sounded like Donald was uninterested in his Family Plan.

Irby testified that she subsequently had trouble getting in touch with Donald's attorney and thus contacted Donald again.[3] Irby texted Donald on February 7, 2020, to tell him that she wanted to proceed with moving A.M.H.-C. from foster placement to placement with Donald's family but that she had not heard from Donald's attorney. Donald replied to Irby that he had given his attorney's phone number to her but that his attorney had told him that Irby had never called him. Irby thus texted Donald again, asking for his attorney's phone number and stating that she thought that Donald had said that he would have his attorney call her. Donald replied by providing his attorney's phone number to Irby. Irby thereafter called Donald's attorney and tried to leave him a message, but she could not reach him. Irby therefore texted Donald again, stating that

---

[3] Donald substituted in new counsel for the *de novo* hearing. Unless otherwise indicated, references to Donald's attorney in this opinion are references to his attorney before the *de novo* hearing.

she had attempted to call his attorney and could not leave a message. Donald finally replied that his attorney was about to call Irby, which Donald's attorney then did.

When asked if she had trouble getting in touch with Donald's attorney on any other occasions, Irby replied, "Yes." But she then clarified, "I would say I had trouble with getting information needed from [Donald's] attorney as well as [Donald]." Irby stated that for instance, she had reached out to Donald on multiple occasions to see if A.M.H.-C. could be placed with any of his family members because A.M.H.-C. was in a foster-only home at that time. But Irby received no response from Donald. Moreover, the only response she received from Donald's attorney about family members with whom A.M.H.-C. could be placed was the mention of an aunt. But when Irby tried to follow up and ask for more information, she received none.

Irby testified that on March 10, 2020, she then texted Donald, asking him if he wanted to have a visit with A.M.H.-C. Irby had not tried to set up a visit after Donald had indicated that he wanted to wait for the DNA test results, but once the DNA test results had confirmed that Donald was A.M.H.-C.'s father, Irby tried to set up visits. Irby testified that Donald, however, remained uninterested in visits. Donald replied to Irby's March 10 text by again providing his attorney's phone number to Irby and by stating that his attorney was "supposed to set that up." Irby testified that she could not recall whether she contacted Donald's attorney after that text to set up a visit but that Donald's attorney never contacted her about setting up a visit. Nor did Donald himself ever follow up with her about visits. Irby texted Donald a video of A.M.H.-C. on April 21, 2020, but she

received no response. Irby also texted Donald a photograph of A.M.H.-C. on May 4, 2020, but she received no response.

Irby did acknowledge that when she tried to set up the visit in March, it was just before "everything went nuts with COVID." Irby further agreed that because of COVID, all the visits were virtual visits; therefore, a visit between Donald and A.M.H.-C. would have consisted of Donald looking at A.M.H.-C. on video. Irby also acknowledged that she did not think that A.M.H.-C. could have bonded with Donald by looking at him on a video screen. Irby testified that in the end, however, Donald never visited A.M.H.-C. during this case. Donald never even asked Irby how A.M.H.-C. was doing. Irby thus agreed that although Donald had been involved in this case since its beginning, it very much appeared that Donald was uninterested in A.M.H.-C.

Donald testified that after his paternity of A.M.H.-C. was established, Irby tried to contact him about setting up visits maybe once or twice. When Irby did so in March, Donald told her to contact his attorney because he thought that that was the appropriate thing to do. Donald's attorney later got in touch with him about visiting A.M.H.-C., but during that time, all the visits were "through the [D]epartment." Donald asked his attorney about why he, as a nonoffending parent, had to go to the Department instead of wherever A.M.H.-C. was. Donald's attorney told him that it was because of COVID and that the Department was only doing the visits through video conference. When asked if that bothered him, Donald replied that he understood the purpose but that A.M.H.-C. was only about seven months old at that time and that he saw no real way to bond with the child over video.

Donald testified that he absolutely wants to develop a relationship with A.M.H.-C. Donald nevertheless acknowledged that he never visited A.M.H.-C. during this case. Donald stated that he had "not been allowed to." Donald also acknowledged, however, that he did not ask the Department for a visit with A.M.H.-C. When asked why he never contacted Irby to set up a visit, Donald replied that he is not a lawyer and that he does not know how it works. Donald testified that he instead asked his attorney to set up a visit on several occasions but that his attorney never reached out to him saying that he had set up a visit. When asked why he did not keep asking for visits if he was not getting them, Donald replied that the Department was not doing visits where he could see A.M.H.-C. physically anyway.

On the morning of May 4, 2020, Irby sent an email to Donald's attorney that stated: "I am sending [Donald's] Family Plan of Service again and would like to point out that contact information for providers are listed within the Family Plan of Service under each task. Also, can you please ask your client to drug test by tomorrow at 12:13PM[?]." At about noon that same day, Irby also texted Donald: "I have provided your attorney with contact information regarding services you were court ordered to complete. I am also asking for you to complete drug testing by 5/5/2020 at 12:00 pm."

Irby testified that this was not the first time that she had given Donald and his attorney information about Donald's services. As stated above, Irby testified that the services in which the Department expected Donald to participate were talked about at the permanency conference. When Irby later attempted to give the Family Plan to Donald, he told her that he wanted communication to go through his attorney. Irby

testified that she therefore emailed Donald's attorney on March 18, 2020, "instructing him with the Family Plan." Irby could not recall whether the Family Plan that she had provided Donald's attorney at that time included contact information for the providers. Irby did recall that around May 4, Donald's attorney claimed that he did not have the Family Plan or could not find it. Irby thus sent Donald's attorney the Family Plan again on May 4. The Family Plan that was sent on May 4 included contact information for the providers.

Donald testified that Irby's May 4 text message to him was the first message that he had received from her asking him to take a drug test and that no one had asked him to take a drug test before then. Donald stated that he talked to his attorney about it, and his attorney told him that he needed to go take the drug test at A & D Tests. Donald was in Austin at the time, so on the morning of May 5, 2020, Donald drove to Waco to take the drug test. When asked why he did not contact Irby and find out about taking a drug test in Austin, Donald replied that he does not know anything about the Department and that his attorney told him to take the drug test at A & D Tests, so he complied. Donald testified that he had no problem taking a drug test anywhere. When Donald arrived at A & D Tests, however, it was closed. Donald therefore began driving back to Austin. Donald also called his attorney but was unable to reach him. Donald testified that he thereafter decided to drive back to A & D Tests to take a photo of the sign on the door for proof that A & D Tests was closed that day. Donald's photo of the sign, which states that A & D Tests was unable to do any type of testing that day because the air conditioning unit was not working, was offered and admitted as evidence. Donald testified that after

he took the photo, he then drove back to Austin and returned to Waco the next day, May 6, 2020, to take the drug test. Donald further stated that that was the only time Irby asked him to take a drug test.

Donald also testified that his attorney only forwarded him Irby's May 4 email with the Family Plan attached on June 22, 2020. The email that Donald received from his attorney was offered and admitted as evidence. Donald testified that although Irby had texted him that she had sent the court-ordered requirement to his attorney on May 4, the first time that he saw the Family Plan was on June 22. Donald stated that that was therefore the first time that he became aware of the services that were required of him. Donald "skimmed through [the Family Plan] pretty well" after he received it. Donald also contacted his attorney and went over the Family Plan with him so that he could be clear on it. Donald testified that he has tried to comply with the Family Plan since receiving it on June 22. Donald also acknowledged, however, that he did not immediately do any services after receiving the Family Plan and that he was not sure when he started the Family Plan.

Irby testified that overall, Donald did not participate in the Family Plan in this case. Irby stated that Donald did not participate in the psychosocial exam even though she had tried to set it up for him on one occasion. Irby also testified that even though she went out to Donald's home on only the one occasion, she does not know if Donald was able to provide a safe and stable environment for A.M.H.-C. because she was not able to go inside Donald's home. Irby testified that furthermore, although she did not directly

ask Donald for his pay stubs, the requirement was on his Family Plan, yet he did not provide any pay stubs to show his financial status.

Irby testified that additionally, she was never informed that Donald had tried to take a drug test in response to her May 4 text message and that Donald did not take a drug test for her on May 6. To her knowledge, Donald never took a drug test during this case. Donald had been placed on the color system by the Department. This required Donald to call a certain number every weekday morning to request the color of the day. On days when Donald was informed that his designated color was the color of the day, he was then supposed to present for drug testing. Not presenting for drug testing would be considered a presumptive positive test.

Irby testified that during this case, between February 3, 2020, and June 17, 2020, Donald's designated color was the color of the day thirteen times but that Donald never took a drug test on any of those days. Irby testified that instead, Donald's attorney emailed her, providing a "very broad response" for why Donald was not working services. According to Irby, Donald was "basically blaming it on COVID-19." Irby informed Donald's attorney at that time that Donald could still drug test because many of her clients were drug testing. Irby acknowledged to Donald's attorney that the places that provided the services were doing things differently but that Donald just needed to call ahead and that they would explain to him what safety precautions needed to be taken.

Irby then finally testified that despite the information being within the Department's knowledge, she had just become aware "not too long before the trial" in

this case that Donald has another case pending with the Department (Case 2). Donald was the nonoffending parent in Case 2, and Irby had been informed that the child in Case 2 had been placed with Donald's mother. Regarding services in Case 2, Irby was not aware if Donald had taken a psychosocial exam but acknowledged that there was no reason why Donald should do it twice. Irby also acknowledged that she had become aware that Donald had the same drug testing color in Case 2 that he had in the case involving A.M.H.-C.

Jalisa Taylor, the Department caseworker for Case 2, testified that Case 2 involved a child who was then two years old. Donald already had a relationship with the child, and his paternity of the child was not in question. Taylor had made the Family Plan for Donald in Case 2, and it included the following requirements: "[a] safe home, protective parenting, drug testing, OSAR in the case that he had a positive drug test and a psychological."

Taylor testified that in the beginning of Case 2, Donald did not communicate with her. The few conversations that she had with Donald consisted of him telling her that he was not going to communicate with her without his attorney and that she needed to text his lawyer for everything. Taylor told Donald at that time that that was fine and thereafter created a group text message with herself, Donald, and Donald's attorney so that everyone would be able to see all the communications. Taylor then spoke with Donald's attorney about the Family Plan, including about visitations and setting up drug tests. Taylor testified that she did not have trouble communicating with Donald's

attorney and that he always promptly called her back. Taylor told Donald's attorney that Donald had to drug test to see the child.

Taylor testified that on August 7, 2020, she texted the group message that the child in Case 2 was at risk of not having placement and that the child would then have to go to a foster home. The Department needed emergency placement. Donald thereafter helped the Department secure placement for the child with Donald's mother. Donald then proceeded to set up some visitation through her. Donald's mother told Taylor that Donald was coming by to see the child and that she had not had any issues thus far. Donald was allowed to visit with the child between 9 a.m. and 8 p.m. whenever his mother allowed.

Taylor testified that Donald also started trying to complete his services in Case 2 around the time that he helped Taylor find placement for the child with his mother. When asked how many times she had asked him to drug test during Case 2, Taylor replied that she did not get to ask him at first because he was not answering her phone calls. For instance, on June 6, 2020, Taylor sent a text to the group message that said, "Please go and drug test today." Taylor received no response, and Donald did not go drug test. When Donald finally helped Taylor secure placement of the child at his mother's home in early August 2020, however, Taylor told Donald that he could not go around the child or his mother's home while the child was there unless he took a drug test. Taylor stated that she believes that Donald took a drug test the next day and that Donald thereafter started calling the number to request the color of the day. Taylor testified that Donald then took a urinalysis that was negative on each of August 14,

August 19, and August 28, 2020. Donald had also completed a urinalysis earlier in May that was negative. Taylor testified that on September 8, 2020, however, Donald took a hair drug test that was positive for marijuana. Taylor stated that this was Donald's first positive drug test.

Taylor testified that Donald had also completed his psychological in Case 2 and that she recalled receiving one pay stub from Donald. Taylor had also received an email the day before that Donald was trying to set up his first parenting class. When asked if it was her understanding that it had been more difficult to schedule the parenting classes because of the limited class sizes due to COVID, Taylor replied that it had been a little harder than usual. When Taylor had met with Donald the month before, Donald had said that the parenting class was full but that he was trying. She advised Donald to continue to call every day until he got in.

Taylor testified that she had not been able to see Donald's home, however. She had attempted to see his home more than twice, including once in August 2020 and once during the week of the *de novo* hearing, which was at the end of September 2020, but the appointments had had to be rescheduled. Taylor stated that she believes that the appointments had to be rescheduled because something always came up with Donald's work and that by the time they rescheduled it, she had to do her monthly visitation with him via Zoom. When asked, however, if she got the impression that Donald was trying to keep her from coming to his house, Taylor replied that Donald "seemed pretty open." Donald had told her that he had no issues with her coming to his home. Taylor also

understood that Donald was self-employed and that his employment sometimes took him out of town. Taylor stated that it therefore just seemed like "things popped up."

Taylor thus testified in conclusion that there was no reason that the Department would be looking at terminating Donald's rights in Case 2 at that time if Donald continued doing what he was doing and had no more positive drug tests. Taylor stated that if, however, Donald continued to test positive on drug tests and continued avoiding letting Taylor come and see his home, then the Department would not plan to reunite Donald with his child in Case 2.

Donald testified that he was willing to do whatever the Department asked of him in this case. Donald acknowledged insisting that both Irby and Taylor go through his attorney. Donald explained that he did not know the law and had some questions about what they were telling him. Donald also agreed that he was concerned about why he was having to "jump through all these hoops" when he was not the offending parent in either of the cases. Donald testified that he, in fact, has a third child, an eighteen-year-old son. Donald raised his son from when he was born until he was twelve years old. His son went to stay with his mother for a few years before coming back to live with Donald when he was fifteen years old. Donald testified that he therefore questioned why he needed to take parenting classes when he was the nonoffending parent, he had raised a child, and he knew how to raise children. Donald testified that he had nevertheless set up parenting classes in Case 2.

Donald further testified that he could not do any services in this case until he received the Family Plan on June 22 and that he was now working services in Case 2.

Donald testified that in total for both cases, he had taken at least ten drug tests. He had just learned that he had a positive drug test, which surprised him. Donald acknowledged that he has used marijuana in the past but stated that he had not used marijuana in years.

Donald testified that he did not know that Irby had previously set up the psychosocial exam. If his attorney had told him that he needed to do that, he would have. Donald stated that he had nevertheless now concluded his psychosocial exam even though it was on August 20, 2020, which was after the trial before the associate judge in this case. When asked if he had actually completed a psychological instead of a psychosocial, Donald replied that he did not know the difference between the two but that he had completed what he was asked to complete. Donald also stated that he went on the date that they gave him and that the appointment had been set up well before the trial before the associate judge.

Donald testified that he had also now provided the Department with several checks that he had written to himself as draws, although he acknowledged that the pay stubs were sent after the trial before the associate judge in this case. Donald stated that he typically paid himself $750 to $1,000 weekly if he needed it. Irby had never asked him for pay stubs, or he would have provided them to her. When the Department did ask, he provided pay stubs to the Department.

Donald also testified that no one from the Department tried to set up a time to come to his home after February 3, when he found out that he was A.M.H.-C.'s father. If they had done so, he would have allowed it. He did not have a problem showing the Department that his house was safe and stable, and he had not let Taylor into his home

yet because of timing. Donald testified that he also believes that he told the Department about having a home in Austin. He informed the Department that he was living in Austin most of the time, but Donald did not know whether Irby knew that he lived in Austin. The Department never came to Austin to see his home there.

Donald testified in conclusion that he thought that it was in A.M.H.-C.'s best interest for the child to be placed with him because he was A.M.H.-C.'s father. Donald further stated that he was capable of raising the child and that he was capable financially. Irby testified, on the other hand, that the Department is looking at unrelated adoption for A.M.H.-C. A.M.H.-C. had been placed in an adoptive home, and to Irby's knowledge, A.M.H.-C. was doing very well there. When asked why it was in A.M.H.-C.'s best interest that Donald's parental rights be terminated, Irby replied:

> He didn't show any interest in this child from the - - even from the very - - very beginning to when we let him know that he was the father of this child. I offered visits with him. He would refer me back to his attorney. I offered - - I sent him pictures and video. He didn't remain in communication. He didn't work services. I asked for family members. Those were not provided to me. And we had to look for other placements. And so I would say because he didn't show any interest in his child, he did not show that he was able to provide a safe and stable home for his child then, that is why we believe it's in the best interest to terminate his rights.

### Discussion

In a proceeding to terminate the parent-child relationship brought under section 161.001 of the Family Code, the Department must establish by clear and convincing evidence two elements: (1) that the respondent parent committed one or more acts or omissions enumerated under subsection (b)(1) of section 161.001, termed a predicate violation, *and* (2) that termination is in the best interest of the child. TEX. FAM. CODE ANN.

§ 161.001(b); *Swate v. Swate*, 72 S.W.3d 763, 766 (Tex. App.—Waco 2002, pet. denied). The factfinder must find that both elements are established by clear and convincing evidence, and proof of one element does not relieve the petitioner of the burden of proving the other. *Holley v. Adams*, 544 S.W.2d 367, 370 (Tex. 1976); *Swate*, 72 S.W.3d at 766. "Clear and convincing evidence" is defined as "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980).

Both legal and factual sufficiency reviews in termination cases must take into consideration whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the matter on which the petitioner bears the burden of proof. *In re J.F.C.*, 96 S.W.3d 256, 264–68 (Tex. 2002) (discussing legal sufficiency review); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002) (discussing factual sufficiency review).

> In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible.

*J.F.C.*, 96 S.W.3d at 266. In a factual sufficiency review, a court of appeals must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *Id.*

> [T]he inquiry must be "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's

allegations." A court of appeals should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient.

*Id.* (footnotes and citations omitted); *see C.H.*, 89 S.W.3d at 25.

### A. Statutory Predicate Grounds

We begin with Donald's second issue in which he contends that the evidence is legally and factually insufficient to establish that he violated Family Code subsection 161.001(b)(1)(O).

Termination under subsection 161.001(b)(1)(O) requires clear and convincing evidence that the parent

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.

TEX. FAM. CODE ANN. § 161.001(b)(1)(O).

Donald first argues that neither the Department nor the trial court had the authority to require him to perform services until he was adjudicated to be the father of A.M.H.-C. Donald asserts that the trial court first ordered him to comply with the Family Plan in December 2019.[4] The trial court, however, did not sign the order establishing the

---

[4] The record shows that the trial court also ordered Donald to comply with the Family Plan on May 18, 2020.

parent-child relationship between Donald and A.M.H.-C. until January 28, 2020. Donald

further points out that he did not find out that he had been adjudicated to be A.M.H.-C.'s

father until February 3, 2020.

But even if we conclude that this argument is correct, the argument does not

account for the fact that Donald failed to comply with the Family Plan even after he had

been adjudicated A.M.H.-C.'s father. Instead, Donald next argues that his failure to

comply should have been excused because he had not been made aware of the

requirements of the Family Plan but that he still made a good faith effort to comply with

the Department's requests and because the ineffective assistance of his trial counsel

played a role in his ability to obtain and work the Family Plan.[5]

Substantial compliance with a service plan is not sufficient to avoid a termination

finding under subsection 161.001(b)(1)(O). *In re M.C.G.*, 329 S.W.3d 674, 676 (Tex. App.—

Houston [14th Dist.] 2010, pet. denied). Subsection 161.001(d) of the Family Code

provides, however:

> A court may not order termination under Subsection (b)(1)(O) based on the
> failure by the parent to comply with a specific provision of a court order if
> a parent proves by a preponderance of evidence that:
>
> (1)    the parent was unable to comply with specific provisions of the
>        court order; and
>
> (2)    the parent made a good faith effort to comply with the order and
>        the failure to comply with the order is not attributable to any fault
>        of the parent.

TEX. FAM. CODE ANN. § 161.001(d).

---

[5] Donald does not raise the effectiveness of his trial counsel's assistance as a separate issue.

But Donald's own testimony shows that he was partially at fault for failing to comply with the Family Plan. Donald testified that after he received the Family Plan on June 22, 2020, he did not immediately do any services and was not sure when he started the Family Plan. The evidence, however, shows that the Family Plan required Donald to participate in random drug testing. Irby testified that to her knowledge, Donald never took a drug test during this case, and Taylor indicated that Donald only began random drug testing in Case 2 in mid-August 2020, on or around when the trial before the associate judge concluded in this case on August 12, 2020.

Considering all the evidence in the light most favorable to the trial court's findings and considering the evidence as a whole, we therefore conclude that a reasonable trier of fact could have formed a firm belief or conviction that Donald violated subsection 161.001(b)(1)(O) and that termination under subsection 161.001(b)(1)(O) was not prohibited by subsection 161.001(d). We overrule Donald's second issue.

In his first issue, Donald contends that the evidence is legally and factually insufficient to establish that he violated Family Code subsection 161.001(b)(1)(N). If multiple predicate violations under subsection 161.001(b)(1) were found in the trial court, we can affirm based on any one ground because only one predicate violation under subsection 161.001(b)(1) is necessary to a termination judgment. *In re T.N.F.*, 205 S.W.3d 625, 629 (Tex. App.—Waco 2006, pet. denied), *overruled in part on other grounds by In re A.M.*, 385 S.W.3d 74, 79 (Tex. App.—Waco 2012, pet. denied). Having overruled Donald's second issue, we need not reach his first issue.

**B.     Best Interest of the Child**

In his third issue, Donald contends that the evidence is legally and factually insufficient to support that termination of his parental rights to A.M.H.-C. was in the child's best interest.

In determining the best interest of a child, a number of factors have been considered, including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent.  *Holley*, 544 S.W.2d at 371–72.  This list is not exhaustive, but simply indicates factors that have been or could be pertinent.  *Id.* at 372. The *Holley* factors focus on the best interest of the child, not the best interest of the parent. *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ).  The goal of establishing a stable, permanent home for a child is a compelling state interest.  *Id.* at 87.  The need for permanence is a paramount consideration for a child's present and future physical and emotional needs. *In re S.H.A.*, 728 S.W.2d 73, 92 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) (en banc).

Here, the Department acknowledged that Donald was not the offending parent in either of the cases in which he found himself involved.  The evidence also shows that

Donald is self-employed and that he possesses some parental abilities because he testified that he has an adult son whom he raised.

A.M.H.-C., however, was just under one year old at the time of the *de novo* hearing. When children are too young to express their desires, the factfinder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.). The evidence here shows that A.M.H.-C. was living in an adoptive home at the time of the *de novo* hearing and was doing very well there. In contrast, A.M.H.-C. had spent no time with Donald.

Additionally, evidence of past misconduct or neglect can be used to measure a parent's future conduct. *See Williams v. Williams*, 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, pet. denied); *Ray v. Burns*, 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ) ("Past is often prologue."); *see also In re V.A.*, No. 13-06-00237-CV, 2007 WL 293023, at *5–6 (Tex. App.—Corpus Christi–Edinburg Feb. 1, 2007, no pet.) (mem. op.) (considering parent's past history of unstable housing, unstable employment, unstable relationships, and drug usage). Here, Donald testified that he had not used marijuana in years, but a short time before the *de novo* hearing, Donald took a hair drug test that was positive for marijuana. Donald also never participated in any type of visit with A.M.H.-C. during this case. Donald tried to provide excuses for this, but in the end, based on this record, Donald has never even met A.M.H.-C.

There is a strong presumption that it is in the child's best interest to preserve the parent-child relationship. *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.]

2003, no pet.). However, considering all the evidence in the light most favorable to the trial court's finding and considering the evidence as a whole, we hold that a reasonable factfinder could have formed a firm belief or conviction that termination of Donald's parental rights was in A.M.H.-C.'s best interest. Accordingly, we overrule Donald's third issue.

## Conclusion

We affirm the trial court's final order of termination after *de novo* hearing.


MATT JOHNSON
Justice


Before Chief Justice Gray,
     Justice Johnson, and
     Justice Smith
Affirmed
Opinion delivered and filed September 29, 2021
[CV06]

